UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

NOV 1 7 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

)
DYNCORP,                                           )
)
     Plaintiff,                                )
)
     v.                                        )    Civil Action No. 97-2839 (PLF)
)
OCEAN MARINE NAVIGATION CO., INC.,                 )
)
     Defendant.                                )
)

OPINION

     This matter is before the Court on plaintiff's motion for summary judgment,

defendant's motion to strike plaintiff's affirmative defenses or for judgment on the pleadings,

and defendant's motion *in limine* to exclude evidence of DynCorp's corporate structure.  The

Court heard argument on these motions on October 24, 2000.  Upon consideration of the briefs

filed by the parties, the exhibits attached to those briefs and the parties' post-argument filings,

as well as the arguments of counsel at the motions hearing, the Court grants plaintiff's motion

for summary judgment.[1]

I. BACKGROUND

     Ocean Marine Navigation Company, Inc. ("Ocean Marine") was incorporated in

Nevada in 1995 with its principal place of business in Annapolis, Maryland.  See Joint Pretrial

Statement at 1.  Ocean Marine is in the business of buying, selling and operating commercial

---

[1]    Because plaintiff's motion for summary judgment is granted, the Court does not
need to consider defendant's motions, which are denied as moot.



ships.  See id.  It was formed specifically to compete for a Navy contract to acquire, outfit for

military use and operate ships for the Navy's Enhanced Military Prepositioning Force

("MPF(E)").  See id. at 1, 3.

On November 3, 1995, the Naval Sea Systems Command ("NAVSEA") issued

Request for Proposal No. N00024-96-R-2200 ("RFP 2200"), seeking bids to provide the Navy

with a ship or ships suitable for the MPF(E).  See Joint Pretrial Statement at 3.  The project

was to be performed in three phases.  In Phase I, the Navy would seek engineering designs for

the conversion of a ship to military specifications necessary for the MPF(E).  See id.

Contractors with winning proposals under Phase I would then be invited to submit technical

and pricing proposals under Phases II and III.  See id. at 4.  From these proposals, the Navy

would select one contractor to perform Phases II and III of the project.  See id.  During Phase

II, the contractor would acquire, design, convert, test and deliver the ship.  See id.  In Phase

III, the winning contractor would operate and maintain the vessel for the Navy for a period of

five years.  See id.

In 1995, Ocean Marine learned that an affiliate of the Ukrainian government,

the Black Sea Shipping Company ("BLASSCO") had four Smirnov-class vessels that it might

be willing to sell and that were suitable for the Navy's MPF(E).  See Joint Pretrial Statement at

4-5.  To insure that Ocean Marine would have a ship available to compete for the Navy

contract, Ocean Marine entered into option contracts to purchase the four vessels.  See id. at

4.[2]  According to the original option contract of September 8, 1995, BLASSCO agreed to sell

_____

[2]       Based on a declaration submitted by J. P. Walters, it appears that BLASSCO
was authorized to sell the four ships but did not have legal title to at least two of them.  See

Ocean Marine the four Smirnov-class vessels for $17.75 million per ship, each equipped with two functional engines, one functional spare engine, a full complement of spare parts, and cargo-loading equipment. See Ocean Marine's Opp., Walters Decl., Ex. 1, September 8, 1995, Memorandum of Understanding ("September 8 MOA").

That same year, Ocean Marine asked DynCorp to assist Ocean Marine in preparing its bid for the Navy contract and to be the potential Phase III operator of the vessel. See Joint Pretrial Statement at 4-5.[3] On September 9, 1996, Ocean Marine and DynCorp entered into a Teaming Agreement, in which Ocean Marine would be the prime contractor, responsible for preparing the Phase II proposal and for acquiring, converting and delivering the ship to the Navy, and DynCorp would be a subcontractor, responsible for operating and maintaining the ship under Phase III. See Mem. in Supp. of Mot. for Summ. J. ("DynCorp's Mot."), Ex. 2, September 1996 Teaming Agreement ("Teaming Agreement") at 2-3.

On April 4, 1996, NAVSEA awarded Ocean Marine and four other bidders Phase I contracts to prepare and submit technical and price proposals for Phases II and III. See Joint Pretrial Statement at 5. Around the same time, DynCorp was introduced to Global Container Lines, Ltd. ("Global Container"), a shipping company that regularly charters

_____

Ocean Marine's Mem. in Opp. to DynCorp's Mot. for Summ. J. ("Ocean Marine's Opp."), Declaration of J.P. Walters, Chairman and Managing Director of Ocean Marine ("Walters Decl.") ¶¶ 1, 20-21. Although the record does not clarify how BLASSCO was able to offer these ships, it is undisputed that BLASSCO did enter into option contracts to sell these ships to Ocean Marine.

[3]     DynCorp is a Delaware corporation with its principal place of business in Reston, Virginia, engaged in providing services based on contracts with the federal government. See Joint Pretrial Statement at 1.

3

Smirnov-class vessels, the type of vessel Ocean Marine intended to purchase from BLASSCO.
See id.  At Ocean Marine's request, DynCorp began working with Global Container as a
subcontractor in preparing the bid for the Navy.  Id. at 5.  DynCorp utilized Global Container
in DynCorp's bid, which Ocean Marine incorporated into its proposal to the Navy.  See id.

After Ocean Marine submitted a Best and Final Offer ("BAFO") to NAVSEA
on February 10, 1997, and a second BAFO on March 21, 1997, the Navy awarded Ocean
Marine Contract No. N00033-97-C-4005 ("Mod 5") on April 9, 1997 to design, convert,
modify and deliver one Smirnov-class ship, the *GTS Bazaliya*, to be renamed the *Roy M.
Wheat*, for the Navy's MPF(E) for $99,975,477.  See Joint Pretrial Statement at 6; DynCorp's
Mot., Ex. 4, April 9, 1997 Award ("Mod 5").[4]  Ocean Marine did not enter into a subcontract
with DynCorp to operate the Navy vessel under Phase III of the project.  See Joint Pretrial
Statement at 6.

Prior to being awarded the contract by the Navy, Ocean Marine had entered into
a new option contract with BLASSCO on April 2, 1997 for the purchase of the *Bazaliya*.  See
Ocean Marine's Opp., Walters Decl., Ex. 2, April 2, 1997, Memorandum of Understanding
("April 2 MOA").  While BLASSCO lowered the price of the *Bazaliya* from $17.75 million to
$15.8 million under the new MOA, Ocean Marine now had to take the ship "as is" and without
any guarantee that the engines or spare parts would be up to the Navy's specifications.  See id.

_____

[4]       The vessel was named the *Vladmir Vavlyaev* before Ocean Marine bought it, and
when Ocean Marine purchased it, the ship was renamed the *Bazaliya*.  See Walters Decl. ¶ 10.
After the contract award, there were a number of subsequent modifications to the contract,
including one on December 7, 1997 that Ocean Marine relies on in substantial part for its
argument in opposition to summary judgment.  See infra at 16-19 and n.13.

Ocean Marine nevertheless purchased the ship and began work under its contract with the Navy.

Soon after work on the *Bazaliya* began, oversight of the project was shifted from NAVSEA to the Military Sealift Command ("MSC"). See DynCorp's Mot., Ex. 3, April 6, 1998, Letter from J. Andrew Jackson, Dickstein Shapiro Morin & Oshinsky, to Dorothy L. Dean, Department of the Navy ("April 6, 1998, Letter") at 13. As Ocean Marine performed work on the project, it invoiced the MSC, which would reimburse Ocean Marine in "progress payments" at 90 percent of the costs incurred. See Ocean Marine's Suppl. Opp. to DynCorp's Summ. J. Mot. ("Ocean Marine's Suppl. Opp."), Affidavit of Captain J.P. "Flip" Walters to Explain the Milestone Payment for the *LCPL Roy M. Wheat* ("Walters Aff.") ¶¶ 6, 8.

As the project progressed, the MSC expressed its concerns over the cost overruns and delays Ocean Marine was experiencing in performing the contract. See DynCorp's Mot., Ex. 6, December 2, 1997, Letter from Dorothy L. Dean, Department of the Navy, to J.P. Walters, Ocean Marine ("December 2, 1997, Letter") at 1-2. Acknowledging these cost overruns, Ocean Marine attributed them to requirements that the MSC imposed on it after the contract was awarded. See April 6, 1998, Letter at 4. It therefore sought a reformation of the contract, a request that the Navy rejected. See id. By April 6, 1998, Ocean Marine estimated that the cost of completion for Phase II would be about $132 million. See id. at 4, 15-16. Rather than continue with the project under these circumstances, the parties agreed on October 8, 1998 to a novation of the contract and entered into a Settlement Agreement. See DynCorp's Mot., Ex. 8, Settlement Agreement at 3. Under its terms, Ocean

5

Marine was released from further performance of the contract, and the Navy paid all of Ocean

Marine's then outstanding bills.  See id.

Meanwhile, on April 18, 1997, which was around the same time that Ocean

Marine began work under Mod 5, the Navy announced a follow-up procurement, RFP No.

N00024-97-R-2207 ("RFP 2207") for an additional ship for the MPF(E).  See Joint Pretrial

Statement at 6.  In anticipation of submitting a bid for RFP 2207, Ocean Marine negotiated

with BLASSCO to extend the purchase option on one of the three vessels BLASSCO originally

had offered, the *Balakleya*, which Ocean Marine intended to offer to the Navy as part of its

bid.  See Walters Decl. ¶ 17.[5]  But while Ocean Marine was negotiating with BLASSCO,

Global Container obtained an injunction from a London court to prevent BLASSCO from

selling any of the three ships to Ocean Marine for RFP 2207.  See id. ¶¶ 17-21.  In order to

compete for RFP 2207, Ocean Marine then decided to purchase outright from the "actual legal

owners" two of the BLASSCO ships, the *GTS Krista* and the *GTS Katie*, rather than enter into

further option contracts with BLASSCO.  Id. ¶¶ 20-21.[6]  As part of its bid for RFP 2207,

Ocean Marine offered the *Katie* for the Navy's MPF(E).  See Ocean Marine's Opp. at 9.

Ultimately, in July 1998, the Navy canceled the follow-up procurement, and Ocean Marine had

_____

[5]     When the September 8 MOA for the *Bazaliya* was renegotiated on April 21,
1997, BLASSCO had indicated that it would not renew Ocean Marine's option contracts for
the other three ships BLASSCO originally had offered to Ocean Marine.  See Walters Decl.
¶ 17.

[6]     These ships were previously named the *Kapitan Smirnov* and the *Inzhener
Yermonshkin*, respectively, and were renamed when they were purchased by Ocean Marine.
See Walters Decl. ¶ 21.

to pay for maintenance, insurance and other costs associated with the *Krista* and the *Katie*. See Walters Decl. ¶ 22.

This suit was originally initiated by DynCorp, which sought both injunctive relief and damages as a result of Ocean Marine's alleged breach of the Teaming Agreement by not choosing DynCorp to be the subcontractor under Phase III. See Pretrial Statement at 2. Thereafter, DynCorp voluntarily dismissed its claims against Ocean Marine, but Ocean Marine filed a counterclaim and then an amended counterclaim, asserting that DynCorp had taken actions that injured Ocean Marine in the performance of its contract with the Navy and in connection with the competition for the follow-up procurement. See id. at 2-3. Ocean Marine alleged misappropriation of trade secrets (Count I); breach of contract (Count II); statutory conspiracy to injure business (Count III); fraud (Count IV); conversion (Count V); and tortious interference with prospective contractual relations (Count VI).

Among other things, Ocean Marine alleged that DynCorp conspired with Global Container, using confidential information DynCorp obtained from Ocean Marine in preparing the original bid, in order to undermine the option contracts Ocean Marine had with BLASSCO. Ocean Marine alleges that as a result of this conspiracy and the conduct of DynCorp and Global Container: (1) the contract terms for the *Bazaliya* were altered to Ocean Marine's detriment, causing it to lose profits that it would have made when the Navy made its "milestone payment"; and (2) DynCorp's actions interfered with Ocean Marine's remaining three purchase options with BLASSCO, forcing Ocean Marine to purchase the *Krista* and the *Katie*. When the Navy withdrew RFP 2207, Ocean Marine was forced to bear the costs of the purchase and maintenance of these ships.

7

## II.  DISCUSSION

While DynCorp's motion is for summary judgment, there was discussion at the motions hearing about whether some of the counts of the amended counterclaim should be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim:  Counts I, III and V of the amended counterclaim, respectively  alleging misappropriation of trade secrets, conspiracy to injure business and conversion.[7]  DynCorp also seeks summary judgment on all counts, claiming that even if all of the facts alleged by Ocean Marine are true, Ocean Marine cannot demonstrate any injury or loss entitling it to damages.  Specifically, DynCorp argues that the facts are undisputed that Ocean Marine suffered no damages under either of the theories it propounds.  DynCorp therefore maintains that it is entitled to judgment as a matter of law.

### A.  Failure to State a Claim

A court should not dismiss a count of the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure unless the plaintiff can demonstrate no set of facts that supports its claim entitling it to relief.  See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1117 (D.C.

---

[7]     Ocean Marine brings its conspiracy claim under Virginia's conspiracy to injure business statute.  See VA. CODE ANN. §§ 18.2-499-500 (Michie 1996).  In Virginia, civil conspiracy is actionable whenever two or more persons act to injure another's business "by any means whatever."  See Catercorp, Inc. v. Catering Concepts, Inc., 431 S.E.2d 277, 282 (Va. 1993).  Thus, the District of Columbia common law rule that civil conspiracy is not actionable as an independent tort is not applicable in this case.  See Barnstead Broadcasting Corp. v. Offshore Broadcasting Corp., 886 F. Supp. 874, 883 (D.D.C. 1995).  The Court therefore will not dismiss Count III of the amended counterclaim.

Cir. 2000). Before dismissing the count for failure to state a claim, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See Harris v. Ladner, 127 F.3d 1121, 1123 (D.C. Cir. 1997). While the complaint is to be construed liberally, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions. See Kowal v. MCI Communication Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

In Count I of the amended counterclaim, Ocean Marine alleges that DynCorp misappropriated trade secrets with respect to the option contracts with BLASSCO. See DynCorp's Mot. at 7-8. Ocean Marine concedes that it does not seek "damages directly related to DynCorp's use of its materials in preparing the competing . . . proposal [from DynCorp and Global Container] (since such damages would be too speculative)," but rather contends that this alleged conduct is "relevant to DynCorp's liability for conspiracy to injure Ocean Marine in it[s] business." Ocean Marine's Opp. at 13. It is established, however, that "the existence of a wrong without some identifiable injury does not provide a basis for redress." Adams v. Bethlehem Steel Corp., 736 F.2d 992, 994 (4th Cir. 1984) (citing Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 41 n.22 (1976)). Misappropriation of trade secrets therefore cannot be sustained as an independent claim because there is no injury identified that the Court can address. Failing to show that it is entitled to compensatory damages as a result of the alleged misappropriation, Ocean Marine also is precluded from seeking punitive damages. Under Virginia law, "an award of compensatory damages is an 'indispensable predicate' for an award of punitive damages."

9

Cancun Adventure Tours, Inc. v. Underwater Designer Co., 862 F.2d 1044, 1048 (4th Cir.

1988) (quoting A & E Supply Co. v. Nationwide Mutual Fire Insurance Co., 798 F.2d 669,

673 (4th Cir. 1986)); see also Fleming v. Moore, 275 S.E.2d 632, 638 (Va. 1981).  Because

Ocean Marine concedes that it has suffered no injury as a result of DynCorp's alleged conduct,

the Court dismisses Count I of the amended counterclaim.[8]

In Count V, Ocean Marine seeks compensatory damages for conversion based

on DynCorp's alleged interference with Ocean Marine's contract with BLASSCO.  Conversion

is "any wrongful exercise of ownership, dominion or control over the personal property of

another in denial or repudiation of his rights thereto."  Curaflex Health Services, Inc. v. Bruni,

877 F. Supp. 30, 32 (D.D.C. 1995); see also United Leasing Corp. v. Thrift Insurance Corp.,

440 S.E.2d 902, 906 (Va. 1994).  Under Virginia law, the rule is that conversion generally

only applies to rights in tangible property, not to money.  See United Leasing Corp. v. Thrift

Insurance Corp., 440 S.E.2d at 906.  As this Court has previously held:

> Money can be the subject of a conversion claim only if the
> plaintiff has the right to a specific identifiable fund of money.  A
> cause of action for conversion, however, may not be maintained
> to enforce a mere obligation to pay money.

Curaflex Health Services v. Bruni, 877 F. Supp. at 32 (citations omitted); cf. United Leasing

Corp. v. Thrift Insurance Corp., 440 S.E.2d at 905-06.  The money Ocean Marine seeks to

---

[8]     Ocean Marine, relying on Advanced Marine Enterprises v. PRC Inc., 501
S.E.2d 148 (Va. 1998), argues that evidence of DynCorp's alleged misappropriation is relevant
to proving its claim that DynCorp conspired to injure Ocean Marine's business.  Of course,
that is not the point.  The fact that such evidence may be relevant to prove Ocean Marine's
other theories of liability has no bearing on whether Ocean Marine has adequately stated a
separate claim for misappropriation.

recover did not come from an identifiable fund and therefore is not recoverable under a conversion theory. The Court therefore dismisses Count V of the amended counterclaim.[9]

### B. Summary Judgment Standard

Under Rule 56 Federal Rules of Civil Procedure, summary judgment should be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P. Material facts are those "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Id. at 255; see also Washington Post Co. v. U.S. Dept. of Health and Human Services, 865 F.2d 320, 325 (D.C. Cir. 1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed. R. Civ. P.; Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the evidence is "merely

---

[9]    In response to the Court's suggestion at the motions hearing that Ocean Marine could not bring both a contract and a conversion claim, Ocean Marine offered to withdraw the conversion claim. See Transcript of the October 24, 2000, Motions Hearing ("Tr.") at 58.

colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.

### C. Ocean Marine's Theories of Damages

As previously noted, "the existence of a wrong without some identifiable injury does not provide a basis for redress." Adams v. Bethlehem Steel Corp., 736 F.2d at 994 (citing Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. at 41 n.22). To maintain an action for breach of contract (Count II), the non-breaching party must not only prove a breach, but also must prove that it was "injured by the breach and [is] entitled to damages." Country Club Association Limited Partnership v. FDIC, 918 F. Supp. 429, 436 (D.D.C. 1996). Under Virginia's civil conspiracy statute (Count III), a showing that damages resulted from the conspiratorial acts is a required element of the tort. See Catercorp, Inc. v. Catering Concepts, Inc., 431 S.E.2d 277, 282 (Va. 1993). To prevail on a claim of fraud in Virginia (Count IV), a plaintiff must show through clear and convincing evidence damages to the party misled. Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc., 507 S.E.2d 344, 346-47 (Va. 1998). Finally, in a tortious interference claim (Count VI), a plaintiff must show damages that resulted from the breach of the contract or expectancy. See Winn v. United Press International, 938 F. Supp. 39, 46 (D.D.C. 1996).

Ocean Marine seeks damages under the amended counterclaim based on two theories. First, Ocean Marine seeks lost profits. It contends that DynCorp's alleged interference with its source of supply caused BLASSCO to alter the terms of the contract for the purchase of the *Bazaliya*, the ship Ocean Marine eventually purchased and began to modify

and convert for the Navy.  The terms of the new contract required Ocean Marine to take the

ship "as is" and, as a result, Ocean Marine had to perform substantial work on the vessel at

great cost to bring it in line with the Navy's specifications.  Ocean Marine contends that it was

entitled to a $25 million milestone payment from the Navy for acquiring and delivering the

ship and that, under the terms of the original September 8 MOA, it would have realized a

substantial profit when that payment was made.[10]  Instead, the terms of the April 8 MOA

forced Ocean Marine to take a ship "as is" and perform additional work on the ship, causing its

profit to dwindle to almost nothing.  Second, Ocean Marine argues that DynCorp's

interference made it necessary for Ocean Marine to purchase the *Krista* and the *Katie* outright

in order to have a realistic chance of being awarded the contract under the follow-up

procurement, RFP 2207.  Ocean Marine asserts that had the alleged interference not occurred,

it could have retained its option contracts instead of incurring the costs of purchasing and

maintaining the vessels.

        Accepting all of Ocean Marine's factual allegations as true for purposes of this

motion, DynCorp argues that Ocean Marine cannot recover damages regardless of the bad acts

allegedly perpetrated by DynCorp because Ocean Marine's entire argument depends on the

---

[10]     From Ocean Marine's filings and its arguments at the hearing, it is unclear what Ocean Marine believes is the "milestone event" that would have triggered the payment of the $25 million.  Prior to and at the hearing, counsel for Ocean Marine argued that the purchase of the ship by Ocean Marine followed by the Navy taking title to the ship was the milestone event.  See Tr. at 51-52.  Later, Ocean Marine explained that the Navy never took title but rather took a first preferred ship mortgage on the ship in June 1997, which presumably is the time when Ocean Marine believes that the milestone payment was due.  See Ocean Marine's Suppl. Opp. at 2.  Despite some confusion over exactly what the milestone event was, Ocean Marine has been consistent with respect to its central contention that the milestone event would have occurred prior to the completion of Phase II.

faulty factual premise that there was to be a milestone payment of $25 million no matter what Ocean Marine's actual ship acquisition and conversion costs were.[11]  DynCorp maintains that there was no such agreement; rather, there was a fixed-price contract in the amount of approximately $100 million, and Ocean Marine was only entitled to a profit if it brought the contract in under that amount.  Because of cost overruns, which the parties agree would have amounted to about $32 million, DynCorp says the contract was a loser from the beginning and there were no profits to be had.  As for Ocean Marine's second argument, DynCorp argues that its actions, even if wrongful, did not proximately cause Ocean Marine's loss.  Rather, Ocean Marine both made its own unreasonable business decision and failed to mitigate its damages.  DynCorp therefore maintains that it is entitled to judgment as a matter of law.

### 1.  The Lost Profits Theory

At oral argument, Ocean Marine provided a chart to the Court which purported to demonstrate that the government had agreed to make a "milestone payment" to Ocean Marine in the amount of $25 million at the time title to the ship was conveyed to the Navy.  See Ocean Marine's Suppl. Opp., Walters Aff., Ex. 2, Components of the $25 Million Milestone Payment for the *Roy M. Wheat* ("Milestone Payment Chart").  According to Ocean Marine, that $25 million included a profit to Ocean Marine above and beyond the price Ocean Marine was to pay BLASSCO for the vessel.  See Tr. at 22-26, 45-48.  If the September 8 MOA had remained in place, Ocean Marine would have been able to purchase the *Bazaliya* for

---

[11]      In the context of the documents, the term "hull" used in phrases such as "hull acquisition cost" is synonymous with "ship."

$17.75 million with two functional main engines, a functional spare engine, spare parts and cargo-loading equipment sufficient to meet the government's specifications. See September 8 MOA. Very little work would have been required to convert and modify the ship to meet the Navy's specifications, and Ocean Marine therefore would have made a substantial profit, a profit Ocean Marine says would have been approximately $7.25 million (the approximate difference between the $17.75 million acquisition cost and the $25 million milestone payment).

Ocean Marine contends that the tortious conduct of DynCorp and its alleged co-conspirator, Global Container, induced BLASSCO to alter significantly the terms of Ocean Marine's option contract. Specifically, under the new contract Ocean Marine was forced to take possession of the ship "as is." See Ocean Marine's Opp. at 7-9; Joint Pretrial Statement at 13. Although BLASSCO reduced the price of the ship from $17.75 million to $15.8 million, Ocean Marine had to expend an additional $9,148,500 purchasing and overhauling the main engines and a spare engine, and purchasing spare parts and cargo-loading equipment. See Milestone Payment Chart.[12] Ocean Marine contends that these expenditures were deducted from what otherwise would have been its profit under the terms of the contract with the Navy. See id. If the September 8 MOA had remained in place, this work would not have been necessary, and Ocean Marine would have netted about $7.25 million in profit after the Navy made the milestone payment to which Ocean Marine believes it was entitled when the contract was formed. See id. Ocean Marine's argument with respect to this first element of its

---

[12]     Ocean Marine had to spend $8,200,000 purchasing and overhauling the engines, $700,000 in spare parts not included with the ship, and $248,000 in cargo-loading equipment. See Milestone Payment Chart.

damages thus turns on whether there was in fact a contractual obligation on the Navy to pay

Ocean Marine $25 million in a milestone payment for the ship in proper condition irrespective

of Ocean Marine's actual costs of purchasing the ship and bringing it into conformity with

specifications.

DynCorp argues that there was no such agreement between the Navy and Ocean

Marine. Rather, all of the contract documents demonstrate that there was a fixed-price

contract under which the Navy was obligated only to make progress payments of up to 90

percent of Ocean Marine's invoiced costs and expenses and then to pay any outstanding costs

and expenses at the end of the project, all totalling no more than approximately $100 million.

See Reply in Supp. of Mot. for Summ. J. ("DynCorp's Reply") at 2-4; Tr. at 5-7. The parties

agree that because of cost overruns and delays, it ultimately became clear that the total contract

would cost the government approximately $132 million, prompting the Navy to enter into a

Settlement Agreement with Ocean Marine rather than pay this amount. See April 6, 1998,

Letter at 15-16; Settlement Agreement. According to DynCorp, the undisputed evidence

demonstrates as a matter of law that there were no lost profits because there were never any

profits to be had under the contract.

a. Mod 9

In its memorandum in opposition, Ocean Marine relies primarily on the

declaration of Julian P. Walters for its "milestone payment"/lost profits argument. See Ocean

Marine's Opp. at 7-8. In its opposition to the statement of material facts, it relies on excerpts

from the deposition of Mr. Walters. See Ocean Marine's Opp. to DynCorp's Statement of

16

Material Facts as to Which There is No Genuine Dispute ("Ocean Marine's Statement of

Material Facts"), ¶ 15 (citing DynCorp's Mot., Ex. 1, Walters Deposition Excerpts).  In

support of this argument, Mr. Walters makes reference to Modification of Contract N00009

("Mod 9") as proof that the Navy agreed to make a $25 million milestone payment:

"Ultimately, in December 1997, the Navy agreed to make the milestone payment for the ship."

Walters Decl. ¶ 16.[13]  Aside from Mod 9, Ocean Marine provided the Court with no

documents prior to oral argument to demonstrate that the Navy had agreed to pay Ocean

Marine a $25 million milestone payment that would have included $7.25 million in profit

above the actual costs incurred by Ocean Marine.

      Mod 9 does not support Ocean Marine's argument that it was entitled to a $25

million milestone payment irrespective of the cost of acquiring and converting the hull.  Ocean

Marine and the Navy did not agree to Mod 9 until December 12, 1997, about nine months

*after* Ocean Marine had actually purchased the ship under the less favorable contract terms of

the April 2 MOA and had begun work on it.  See Mod 9.  By that time, the September 8

MOA, on which Ocean Marine necessarily relies for its argument that a profit of

approximately $7.25 million was assured, was ancient history; all parties knew that Ocean

Marine had purchased a ship "as is" and had to do substantial work to meet specifications.

Thus, Mod 9 "establishe[d] milestones for the acquisition of the ship's hull and engines,"

setting forth separately as "milestones" the costs for hull acquisition, order placement of three

---

[13]     On December 12, 1997, the Navy agreed to pay Ocean Marine $24,950,000 for
Ocean Marine's hull acquisition costs, the costs of providing spare parts and cargo-loading
equipment, and the purchase and delivery of three gas turbine engines in accordance with Navy
specifications.  See Ocean Marine's Suppl. Opp., Walters Aff., Ex. 7, Mod 9.

engines, the delivery of the first two engines and the delivery of the third engine, for a total of $24.95 million. Id. There was no profit in this figure, let alone the $7.25 million Ocean Marine claims that the Navy agreed to pay. Furthermore, Mod 9 expressly stated: "The total contract price remains unchanged." Id.

The payments reflected in Mod 9 correspond almost exactly to the actual costs that Ocean Marine in fact incurred from the time it began working on the project. Ocean Marine's hull acquisition cost was $15.8 million, the cost of the spare parts was $700,000, and the cost of the cargo-loading equipment was $248,500, for a total of $16,748,500. See Milestone Payment Chart. This represents only a $1,500 discrepancy between the Navy's payment under Mod 9 and Ocean Marine's actual costs. The costs to Ocean Marine for the engines was $8.2 million, which is the exact amount the Navy agreed to pay Ocean Marine under Mod 9. See id. The grand total of Ocean Marine's actual costs thus was $24,948,500. That this amount corresponds so closely to the $24.95 million set forth in Mod 9 is not surprising since Ocean Marine had informed the Navy of its actual costs in an invoice submitted by Ocean Marine on June 2, 1997, six months before Mod 9 was issued. See DynCorp's Mot., Ex. 5, June 2, 1997, Request for Progress Payment ("June 2, 1997, Request") at Attach. 1; Mod 9 at 4. The Court therefore must conclude that the Navy issued Mod 9 to cover only Ocean Marine's actual costs over the previous nine months and not to give Ocean Marine a profit.

Ocean Marine argues that if the September 8 MOA had remained in place, it would have realized a profit because the $25 million milestone payment was $7.25 million more than its hull acquisition cost of $17.75 million under the original agreement with

18

BLASSCO.  See Tr. at 44-45.  Mod 9 provides no support for this argument, however,

because Mod 9 was issued long after the September 8 MOA had been superseded by the April

2 MOA, and Mod 9 covered only Ocean Marine's actual hull acquisition costs of which the

Navy was aware by December 1997.  If Ocean Marine could produce any document suggesting

that Ocean Marine was entitled to such a milestone payment all along, then its contention that

it would have received a profit under Mod 9 had the original MOA remained in place might be

plausible.  Otherwise, the terms of the September 8 MOA are irrelevant because Mod 9 was an

agreement to compensate Ocean Marine only for the costs it actually incurred as known to the

Navy, specifically, the purchase of the ship under the terms of the April 2 MOA and the costs

incurred to bring the ship into line with the Navy's requirements.

### b.  Contract Documents

At the motions hearing, Ocean Marine's counsel requested leave to file a post-

argument memorandum with additional documentation to prove that the milestone payment was

always part of the contract between Ocean Marine and the Navy, and that Ocean Marine was

entitled all along to a $25 million milestone payment from the Navy, including a $7.25 million

profit.  On October 26, 2000, Ocean Marine submitted its supplemental opposition to

DynCorp's motion for summary judgment, including an affidavit of Mr. Walters and attached

exhibits, four of which Ocean Marine argues support its argument.

Ocean Marine relies upon Mod 5, which awarded the contract to Ocean Marine

on April 9, 1997.  Mod 5 incorporated Ocean Marine's previous two BAFOs into the contract

– one dated February 10, 1997 and the other dated March 21, 1997.  See Ocean Marine's

19

Suppl. Opp., Walters Aff. ¶ 5 & Ex. 4, Mod 5.  In the February 10, 1997 BAFO, Ocean

Marine stated that the "preconversion acquisition" cost of the ship to the Navy was $25

million.  See id. ¶ 2 & Ex. 1, February 10, 1997 BAFO ("February 10 BAFO").  In the March

21, 1997 BAFO, it described the terms of the September 8 MOA between Ocean Marine and

BLASSCO.   See id. ¶ 4 & Ex. 3, March 21, 1997 BAFO ("March 21 BAFO").  Although

Mod 5 expressly incorporated only the March 21 BAFO, for the purposes of this motion the

Court will accept Ocean Marine's contention that both BAFOs were incorporated into Mod 5.

See Walters Aff. ¶ 5; Mod 5.  The fourth document on which Ocean Marine relies is a portion

of RFP 2200 stating that all progress payments would be made at 90 percent of the actual costs

except for the hull acquisition costs which would be paid at "100 [percent] of the purchase

price";  Ocean Marine says that it understood this to be the milestone payment.  Walters Aff.,

Ex. 6, RFP 2200 Excerpt; see Walters Aff. ¶ 6.

   After careful review, the Court concludes that, even drawing all reasonable

inferences in Ocean Marine's favor, these documents do not demonstrate that the Navy was

obligated to make a $25 million milestone payment when Ocean Marine acquired and delivered

the ship.  In fact, the clear and unambiguous language of the documents supports the opposite

conclusion, namely, that the Navy and Ocean Marine agreed to a fixed-price contract of

$99,975,477 under which Ocean Marine would receive a profit only if the expenses incurred

were less than the contract price.  None of these four documents states that the Navy must pay

Ocean Marine a $25 million milestone payment for acquisition and delivery of the ship

regardless of the actual cost.  There simply is no support in the contract language for Ocean

Marine's contention, and the Court can grant summary judgment for DynCorp on that basis alone. [14]

Even if Ocean Marine is entitled to all reasonable inferences that can be drawn in its favor from the documents submitted, the Court concludes that the only reasonable inferences that can be drawn from these contract documents are that: (1) the contract between Ocean Marine and the Navy was for a fixed-price, with Ocean Marine being entitled to a profit only if the contract came in under $100 million, and (2) Ocean Marine was never entitled to a $25 million milestone payment that would have included $7.25 million (or any other particular amount) in profit.

The explicit terms of Mod 5 provide no support for Ocean Marine's argument. The clear language of Mod 5 indicates that the Navy awarded Ocean Marine the contract for Phase II and agreed to pay it a total of $99,975,477 in exchange for its providing, designing, converting and modifying a vessel for use in the Navy's MPF(E). See Mod 5. The words "milestone" or "milestone payment" appear nowhere in Mod 5, and there is nothing whatsoever in Mod 5 itself to suggest that the Navy agreed to make a $25 million milestone payment for the ship. To infer that the Navy agreed to such a payment is unreasonable. Both the clear terms of the contract and the only reasonable inferences that can be drawn from it

_____

[14]     When the terms of a contract are "clear and unambiguous, the interpretation of those terms presents a question of law." Musselman v. Glass Works, L.L.C., 533 S.E.2d 919, 921 (Va. 2000). Unambiguous contract terms are afforded their plain meaning without resort to extrinsic evidence. See Providence Square Associates L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). If the Court determines that the terms of a contract are clear and unambiguous, summary judgment is appropriate. See Barnstead Broadcasting Corp. v. Offshore Broadcasting Corp., 886 F. Supp. at 878, 882.

confirm that the Navy and Ocean Marine agreed that Phase II would be performed for a fixed-price of just under $100 million and that Ocean Marine would be entitled to a profit only if the costs it incurred were under the contract price.

The Court therefore turns to the two BAFOs that Mr. Walters contends were incorporated into Mod 5 as part of the contract between the Navy and Ocean Marine. Nowhere in the March 21 BAFO does Ocean Marine request a $25 million milestone payment for the ship itself. Although the March 21 BAFO did inform the Navy of the terms of the September 8 MOA, it conspicuously failed to mention the price of the ship to the Navy or a $25 million milestone payment. See March 21 BAFO. The document does confirm that the Navy was *aware* of the terms of the September 8 MOA, but the March 21 BAFO provides no support for Ocean Marine's central contention, namely, that when the contract was awarded, the Navy agreed to a milestone payment with a $7.25 million profit when Ocean Marine acquired and delivered the ship to the Navy.[15]

The February 10 BAFO also lacks any language stating that the Navy would make a milestone payment to Ocean Marine for acquiring and delivering the *Bazaliya*. Ocean Marine directs the Court's attention to a portion of the BAFO stating that the "preconversion acquisition cost to the Government of Ocean Marine's proposed primary ship . . . is . . .

---

[15]     There is a reference to a "required milestone schedule that identifies significant milestones," but this language makes no reference to a requirement that the Navy make a "milestone payment." March 21 BAFO. The Court can infer only that Ocean Marine agreed to a "schedule" or timetable for the completion of certain aspects of Phase II, but it would be unreasonable to infer from the reference to such a schedule that the Navy agreed to make a $25 million milestone payment with $7.25 million in profit for the acquisition and delivery of the ship.

$25,000,000.00." See February 10 BAFO.  Ocean Marine then asks the Court to infer from

this sentence that: (1) Ocean Marine proposed that it should receive a milestone payment of

$25 million with $7.25 million in profit, (2) the Navy agreed to make such a payment, and

(3) this milestone payment would be made when Ocean Marine acquired and delivered title to

the ship.  Based solely on this single sentence, such inferences obviously are unreasonable.

And placing this sentence in the context of the entire document gets Ocean Marine no further.

In fact, the reference to a $25 million estimate for the "preconversion acquisition cost" of the

ship undermines Ocean Marine's argument and supports DynCorp's position.

       Attached to the February 21 BAFO is a chart that lists all of the project's

estimated costs broken down by the type of work to be performed in Phase II of the project.

See February 10 BAFO, Attachment 2.[16]  The chart contains a column entitled Estimated Cost,

which lists several items of work Ocean Marine intended to perform.  For each item of work,

the costs of labor, direct materials and overhead are added together to yield a total cost for

each item of work.  The totals for each item of work are then added together to come up with

the Sub-Total-Cost represented on Line B.  At Line C/Proposed Profit, Ocean Marine

calculates its expected profit by taking 2.25 percent of the Sub-Total-Cost.  The Sub-Total-

Cost and Proposed Profit are then added together to arrive at a total of $99,975,477, the actual

contract price including a small profit.

       On Line A-100 of the chart, the costs for the hull structure are listed, including

the cost for direct materials of $35,268,271.  To explain how this figure was calculated, Ocean

---

[16]    Attachment 2 is Bates-numbered "O 005449."  A copy of this chart has been
attached to this opinion.

Marine submitted Attachment 3 to the February 21 BAFO which sets out the various components of this $35 million figure.[17] The first item listed under the category "Hull Structure" is a $25 million estimate for the general hull structure, that is, the ship itself. Thus, the $25 million figure for the ship is included in the $35 million appearing in Attachment 2. Ocean Marine does not state in either attachment that the $25 million includes a profit of about $7.25 million, nor does it request that the $25 million be paid as a milestone payment.

The only conclusion that can be drawn from these two attachments is that the $25 million for the ship was one of several of Ocean Marine's *estimated costs* for Phase II, not a milestone payment for a specific part of the project that included a profit. They confirm that Ocean Marine never asked the Navy for a milestone payment for the ship itself. See Walters Aff. ¶ 8. Instead, at the time it submitted its February 10 BAFO, Ocean Marine understood that it would receive a profit equal to 2.25 percent of its *total actual costs for the entire project*. If the total cost for the project came in under $100 million, Ocean Marine would make a profit; otherwise it would not. Contrary to Ocean Marine's suggestion, the only reasonable inferences that can be drawn from the February 10 BAFO and its attachments are that (1) Ocean Marine would receive a profit only if the costs incurred were under $99,925,477, and (2) there was no agreement by the Navy to make a milestone payment.

The final document submitted by Ocean Marine after oral argument is a portion of the Navy's RFP stating that "the hull acquisition cost will be paid at 100 [percent] of the purchase price." RFP 2200 Excerpt. This phrase, however, is most reasonably understood to

---

[17]    The relevant portion of Attachment 3 is Bates-numbered "O 005450" to "O 005451" and is also attached to this opinion.

24

mean only that the Navy agreed to pay 100 percent of the price Ocean Marine actually paid for

acquiring the hull instead of following the normal agreed-upon practice of paying 90 percent of

any costs as a progress payment.  The fact that this section of the RFP was entitled "Progress

payments" and modifies a section of the original agreement relating to progress payments

supports this reading.  See RFP 2200 Excerpt.  The only reasonable inference that can be

drawn from this document is that Ocean Marine was to receive only progress payments –

usually at 90 percent of Ocean Marine's invoiced costs but in the case of the hull at 100

percent – and not a milestone payment with built-in profit.  Indeed, in an invoice submitted to

the Navy on June 2, 1997, Ocean Marine stated that its hull acquisition cost was $15.8 million,

demonstrating that Ocean Marine itself understood the phrase "hull acquisition cost" to

represent the price it actually paid for the ship, since $15.8 million was the amount actually

paid to BLASSCO.  See June 2, 1997, Request.  Because the provision of the RFP cited by

Ocean Marine cannot reasonably be interpreted to mean that the Navy would make a milestone

payment regardless of the actual cost of the ship, the Court concludes that this document does

not prove that Ocean Marine was entitled to a $25 million milestone payment that included

profit.

There being no factual predicate and no documentary evidence to support Ocean

Marine's argument that the Navy was obligated to pay Ocean Marine a $25 million milestone

payment which would have included $7.25 million in profit, Ocean Marine's claim for lost

profits fails.  The undisputed evidence shows that the contract was for a fixed price and that

Ocean Marine would realize a profit only if the Phase II costs were less than the contract price.

The undisputed evidence also shows that if the contract had been performed to completion,

Ocean Marine would have lost about $32 million.  As a result, there simply were no profits to be had, and DynCorp's alleged bad acts could not have changed that fact.  Accordingly, there is no scenario under which Ocean Marine can recover lost profits.  The Court therefore grants summary judgment for DynCorp with respect to Ocean Marine's claim for lost profits.

### 2.  Cost of Purchase and Maintenance of the *Krista* and the *Katie*

Under its second theory, Ocean Marine claims that it should be able to recover the costs associated with the purchase and maintenance of the *Krista* and the *Katie* because Ocean Marine was forced to purchase these ships as a result of DynCorp's alleged interference with the BLASSCO purchase options.  When BLASSCO refused to extend Ocean Marine's purchase options on the *Balakleya*, the *Krista* and the *Katie*, Global Container used that opportunity to secure a ruling of a London court enjoining BLASSCO from selling the ships to "anyone else" but Global Container.  Walters Decl. ¶¶ 17-20.  Although BLASSCO eventually agreed to extend the option on the *Balakleya*, Ocean Marine felt that in the face of the London court's decision, an option contract would have been insufficient to show that it could deliver lien-free title to the Navy.  See id. ¶¶ 17, 21.  Ocean Marine therefore concluded that to be "taken seriously" by NAVSEA when bidding on RFP 2207, Ocean Marine would need to produce actual title to a vessel suitable for the MPF(E).  Ocean Marine Opp. at 8-9; see also Walters Decl. ¶¶ 17-21.  Seeking out the "actual legal owners" of the *Krista* and the *Katie*, Ocean Marine purchased these ships on December 12, 1997.  Walters Decl. ¶ 21; see also

Walters Deposition Excerpts at 457.[18]  On January 5, 1998, Ocean Marine offered the *Katie* to the Navy as part of its bid for RFP 2207.  See Ocean Marine's Opp. at 9.  When the Navy eventually canceled the follow-up procurement, Ocean Marine was forced to pay the purchase price, maintenance and other costs associated with the ships.  See Walters Decl. ¶ 21.

Ocean Marine argues that if DynCorp had not interfered with its contracts with BLASSCO, Ocean Marine could have relied on the purchase options to demonstrate to the Navy that it could deliver lien-free title instead of actually purchasing the ships.  It maintains that it is entitled to damages as a result of DynCorp's alleged conduct.  The heart of Ocean Marine's claim for the recovery of damages under this theory is tortious interference with prospective contractual relations (Count VI).[19]

To prove tortious interference with contract or a prospective contract, Ocean Marine must show: (1) either that a valid contract or a business expectancy existed, (2) knowledge of this relationship on the part of the defendant, (3) intentional interference with that relationship to induce a breach of the contract or expectancy, and (4) damages resulting from the breach of the contract or expectancy.  See Winn v. United Press International, 938 F.

---

[18]     From the record, it is somewhat unclear who sold the *Krista* and the *Katie* to Ocean Marine.  Mr. Walters states that the "actual legal owners" of the ships were sought out and that Ocean Marine purchased the ships from them.  Walters Decl. ¶ 21.  In other places, Ocean Marine seems to suggest that it purchased the ships from BLASSCO.  See DynCorp's Statement of Material Facts as to Which There Is No Genuine Dispute ¶ 17; Ocean Marine's Statement of Material Facts ¶ 17.  Elsewhere, it is simply not clear who sold the ships to Ocean Marine.  See Walters Deposition Excepts at 457.  Regardless of the confusion, what is undisputed, and what is a material fact in this case, is that Ocean Marine did purchase the ships on December 12, 1997.  See id.

[19]     Ocean Marine also seeks damages on these facts for conspiracy to injure business (Count III) and fraud (Count IV).

Supp. 39, 46 (D.D.C. 1996); Chaves v. Johnson, 335 S.E.2d 97, 102 (Va. 1985); see also

RESTATEMENT (SECOND) OF TORTS § 766 (1979).  The damages that Ocean Marine claims

resulted from the breach of contract or expectancy are the costs associated with the subsequent

purchase and maintenance of the *Krista* and the *Katie*.  Such damages are recoverable in a

tortious interference case so long as the alleged interference is the legal or proximate cause of

those losses.  See RESTATEMENT (SECOND) OF TORTS § 774A(1)(b) & cmt. d; see also Duggin

v. Adams, 360 S.E.2d 832, 835-36 (Va. 1987) (plaintiff required to show that interference

caused him damage); Chaves v. Johnson, 335 S.E.2d at 104 (trial court's finding of no

proximate cause rejected because on the facts presented jury could have found proximate

cause).  Ocean Marine therefore must prove that DynCorp's alleged bad acts were the

proximate cause of the costs incurred as a result of the purchase and maintenance of these two

ships.

Assuming that DynCorp took actions that interfered with Ocean Marine's option

contracts with BLASSCO, Ocean Marine cannot recover because no reasonable jury could find

on the facts presented that these alleged bad acts were the proximate cause of Ocean Marine's

damages.  In L & M Beverage Company, Inc. v. Guinness Import Co., 1996 WL 368327, *3

(E.D. Pa. June 24, 1996), L & M Beverage Company sued Guinness Import Co. alleging that

Guinness caused L & M to sell its distribution rights to another company at a loss.  Guinness

had a distribution agreement with L & M but sought to revoke L & M's distributorship,

making false complaints about L & M's performance under the agreement.  See id.  Feeling

pressure from Guinness, L & M decided to sell its distribution license to another distributor at

a substantially reduced cost.  See id. at * 3.  Although there was evidence that Guinness

exerted pressure on L & M to sell its distribution rights, the court concluded that L & M itself caused the injury it suffered:

> L & M made a considered business decision to sell its distribution rights, rather than seek to enjoin Guinness' allegedly wrongful termination under . . . the Liquor Code.  That business decision, and not Guinness' conduct, was the proximate cause of L & M's having relinquished future profits on the brands.

Id.  Because the loss was the result of L & M's independent business decision, the court concluded that L & M could not recover damages from Guinness.

Similarly, the Court concludes that Ocean Marine's purchase of the *Krista* and the *Katie* was the product of its own independent business decision.  While DynCorp's alleged conduct might have influenced that decision, Ocean Marine could have made other choices when it suspected that DynCorp was interfering with its contract.  It could itself have sought an injunction, a declaratory judgment or money damages from a court in London or in the United States, or it could have sought to appeal the London court's judgment.  Ocean Marine did neither.  Rather, it made the decision that because of the London court's ruling it was in its best interests to obtain actual title to these ships.  See Ocean Marine's Opp. at 9; see also Walters Decl. ¶ 21.  Ocean Marine also made the decision that it needed to purchase not one but two ships to have a realistic chance of being awarded the contract.  See Walters Decl. ¶ 21. When the Navy canceled the bid, Ocean Marine was stuck with the costs associated with the purchase and continuing maintenance of the ships.  See Joint Pretrial Statement at 13.  These costs, however, were not the result of DynCorp's alleged interference but rather were the product of Ocean Marine's independent business decision.  Ocean Marine therefore cannot be awarded any damages.

29

Finally, when a party is injured by the acts of another, the wronged party must take reasonable actions to minimize the resulting damages. To the extent that unreasonable acts taken by the plaintiff are the cause of enhanced damages, plaintiff may not recover those enhanced damages. See Lawrence v. Wirth, 309 S.E.2d 315, 317 (Va. 1983); see also Plywood Panels, Inc. v. M/V Sun Valley, 804 F. Supp. 804, 812-13 (E.D. Va. 1992). Under the circumstances of this case, Ocean Marine acted unreasonably in purchasing two ships from BLASSCO. The Navy had just recently announced the follow-up procurement, and although Ocean Marine had won the original bid, that served as no guarantee that it would win the second bid. Furthermore, the Navy sought only one additional ship for the MPF(E), not two, making the purchase of two ships itself unreasonable. See Joint Pretrial Statement at 6. As with the proximate cause analysis, the Court concludes that Ocean Marine's damages were the result of its own independent business decision and not DynCorp's alleged wrongdoing.[20]

An Order and Judgment consistent with this Opinion was issued on November 6, 2000.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 11/17/00

---

[20]   In Virginia, to prove statutory civil conspiracy or fraud, there also must be a showing of proximate cause. See Caviness v. Derand Resources Corp., 983 F.2d 1295, 1305 (4th Cir. 1993) (fraud); Murray v. Hadid, 385 S.E.2d 898, 903-04 (Va. 1989) (fraud); Allen Realty Corp. v. Holbert, 318 S.E.2d 592, 596 (Va. 1984) (conspiracy). Because proximate cause is a required element of both civil conspiracy and fraud (Counts III and IV), this analysis applies to these counts just as it applies to the tortious interference count.

UNIT PRICE ANALYSIS - BASIC CONSTRUCTION

NAVSEA 4280/2 (6-75) (formerly NAVSHIPS 4280/2) (FRONT)

OMB APPROVAL NO 45-R271

| | | | | INVITATION NO. RFP-N00024-44-R-2200 P R and Contract N00024-44-C-2209 NO OF VESSELS COVERED BY THIS UNIT PRICE ANALYSIS 1 |
|---|---|---|---|---|

**BIDDER** Ocean Marine Navigation Company, Inc.

**ADDRESS** 1329 Connecticut Ave., N.W., Washington D.C. 20036 Office: (410) 647-5141, Fax: (410) 644-5867

**VESSEL** GTS VLADIMIR VASLYAEV

| ITEM | DIRECT LABOR HOURS | DIRECT LABOR DOLLAR | DIRECT MATERIAL 1/ | OVERHEAD | TOTAL |
|---|---|---|---|---|---|
| A. ESTIMATED COST | | | | | |
| 100 HULL STRUCTURE | 309,405 | $11,757,390 | $35,268,271 | $0 | $47,025,681 |
| 200 PROPULSION PLANT | 900 | $34,200 | $2,300,716 | $0 | $2,334,916 |
| 300 ELECTRIC PLANT | 28,097 | $991,686 | $4,662,962 | $0 | $5,654,648 |
| 400 COMMAND & SURVEILLANCE | 9,692 | $368,296 | $2,385,976 | $114 | $2,754,386 |
| 500 AUXILIARY SYSTEMS | 48,369 | $1,838,022 | $16,119,814 | $248 | $17,958,084 |
| 600 OUTFIT AND FURNISHINGS | 6,808 | $258,828 | $6,966,033 | $1,027 | $7,225,688 |
| 700 ARMAMENT | 0 | $0 | $0 | $0 | $0 |
| 800 INTEGRATION/ENGINEERING | 68,428 | $2,600,188 | $12,179,718 | $5,895 | $14,785,901 |
| 900 SHIP ASSEMBLY & SUPPORT SERVICES | 0 | $0 | $36,157 | $87 | $36,244 |
| B. SUB-TOTAL - COST | 469,695 | $17,848,410 | $79,919,647 | $7,471 | $97,775,528 |
| C. PROPOSED PROFIT ( % OF LINE B) 2.25% | | | | | $2,199,949 |
| D. GRAND TOTAL - UNIT PRICE | | | | | $99,975,477 |

1/DIRECT MATERIAL BREAKDOWN

| | |
|---|---|
| A DIRECT (Stores) | |
| B PURCHASED PARTS | |
| C SUBCONTRACTS (Major) | |
| 1 | |
| 2 See Tables Numbers 1-7 & 1-8 | |
| 3 | |
| 4 | |
| TOTAL | |

This is to certify that information herein is based upon or compiled from the books and records of this company and is accurate to the best of my knowledge and belief.

**NAME OF FIRM** Ocean Marine Navigation Company, Inc.

**ADDRESS** 1329 Connecticut Ave., N.W., Washington D.C. 20036 Office: (410) 647-5141, Fax: (410) 644-5867

**BY (Name)** J. P. Walters

**SIGNATURE** [signature]

**TITLE** Managing Director

**DATE** 2/10/97

"Best and Final Offer"

Attachment 2

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN
ACCORDANCE WITH BOARD ORDER

O 005449

NAVSEA 4280/2A (8-78)

**UNIT PRICE ANALYSIS - SUMMARY**
**(By SWBS Group)**
**OMN, GTS VLADIMIR VASLYAEV**

OMB APPROVAL NO 45-R271

| SWBS | DESCRIPTION | Man Hours | Total Material (Sub Esc + Matl Esc.) |
|---|---|---|---|
| GROUP 1  HULL STRUCTURE | | | |
| 100 | HULL STRUCTURE, GENERAL | | 25,000,000 |
| 110 | SHELL AND SUPPORTING STRUCTURE | 134,800 | 3,406,830 |
| 111 | Shell Plating, Surf. Ship and Submarine Press. Hull | | |
| 112 | Shell Plating, Submarine Non-Pressure Hull | | |
| 113 | Inner Bottom | | |
| 114 | Shell Appendages | | |
| 115 | Stanchions | | |
| 116 | Longit. Framing, Surf. Ship and Submarine Press. Hull | | |
| 117 | Transv. Framing, Surf. Ship and Submarine Press. Hull | | |
| 118 | Longit. and Transv  Submarine Non-Press  Hull Framing | | |
| | | | |
| 120 | HULL STRUCTURAL BULKHEADS | | |
| 121 | Longitudinal Structural Bulkheads | | |
| 122 | Transverse Structural Bulkheads | 3,424 | 38,745 |
| 123 | Trunks and Enclosures | 24,918 | 393,929 |
| 124 | Bulkheads in Torpedo Protection System | | |
| 125 | Submarine Hard Tanks | | |
| 126 | Submarine Soft Tanks | | |
| | | | |
| 130 | HULL DECKS | 78,776 | 347,093 |
| 131 | Main Deck | | |
| 132 | 2nd Deck | | |
| 133 | 3rd Deck | | |
| 134 | 4th Deck | | |
| 135 | 5th Deck and Decks Below | | |
| 136 | 01 Hull Deck (Forecastle and Poop Decks) | | |
| 137 | 02 Hull Deck | | |
| 138 | 03 Hull Deck | | |
| 139 | 04 Hull Deck and Hull Decks Above | | |
| | | | |
| 140 | HULL PLATFORMS AND FLATS | | |
| 141 | 1st Platform | | |
| 142 | 2nd Platform | | |
| 143 | 3rd Platform | | |
| 144 | 4th Platform | | |
| 145 | 5th Platform | | |
| 149 | Flats | | |
| | | | |
| 150 | DECK HOUSE STRUCTURE | 60,728 | 1,386,089 |
| 151 | Deckhouse Structure to First Level | | |
| 152 | 1st Deckhouse Level | | |
| 153 | 2nd Deckhouse Level | | |
| 154 | 3rd Deckhouse Level | | |
| 155 | 4th Deckhouse Level | | |
| 156 | 5th Deckhouse Level | | |
| 157 | 6th Deckhouse Level | | |
| 158 | 7th Deckhouse Level | | |

Attachment 3

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal.

File Name: OMN_PC3.xls
"BAFO"
Date: 2/10/97

Page 1 of 12

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN
ACCORDANCE WITH BOARD ORDER

O 005450

NAVSEA 4280/2A (8-78)

**UNIT PRICE ANALYSIS - SUMMARY**
**(By SWBS Group)**
**OMN, GTS VLADIMIR VASLYAEV**

OMB APPROVAL NO. 45-R271

| SWBS | DESCRIPTION | Man Hours | Total Material (Sub.Esc.+ Matl.Esc.) |
|---|---|---|---|
| 159 | 8th Deckhouse Level and Above | | |
| | | | |
| 160 | SPECIAL STRUCTURES | | |
| 161 | Structural Castings, Forgings, and Equiv. Weldments | | |
| 162 | Stacks and Macks (Combined Stack and Mast) | | |
| 163 | Sea Chests | | |
| 164 | Ballistic Plating | | |
| 165 | Sonar Domes | | |
| 166 | Sponsons | | |
| 167 | Hull Structural Closures | 6,639 | 3,899,446 |
| 168 | Deckhouse Structural Closures | | |
| 169 | Special Purpose Closures and Structures | | |
| | | | |
| 170 | MASTS, KINGPOSTS, AND SERVICE PLATFORMS | | |
| 171 | Masts, Towers, Tetrapods | | |
| 172 | Kingposts and Support Frames | | |
| 179 | Service Platforms | | |
| | | | |
| 180 | FOUNDATIONS | | |
| 181 | Hull Structure Foundations | | |
| 182 | Propulsion Plant Foundations | | |
| 183 | Electric Plant Foundations | | |
| 184 | Command and Surveillance Foundations | | |
| 185 | Auxiliary Systems Foundations | | |
| 186 | Outfit and Furnishings Foundations | | |
| 187 | Armament Foundations | | |
| | | | |
| 190 | SPECIAL PURPOSE SYSTEMS | | |
| 191 | Ballast, Fixed or Fluid, and Buoyancy Units | 120 | 796,139 |
| 192 | Compartment Testing | | |
| 195 | Erection of Sub Sections (Progress Report Only) | | |
| 198 | Free Flooding Liquids | | |
| 199 | Hull Repair Parts and Special Tools | | |
| | SUBTOTAL: | 309,405 | 35,268,271 |
| | | | |
| **GROUP 2 PROPULSION PLANT** | | | |
| 200 | PROPULSION PLANT, GENERAL | | |
| 210 | ENERGY GENERATING SYSTEM (NUCLEAR) | | |
| 211 | (Reserved) | | |
| 212 | Nuclear Steam Generator | | |
| 213 | Reactors | | |
| 214 | Reactor Coolant System | | |
| 215 | Reactor Coolant Service Systems | | |
| 216 | Reactor Plant Auxiliary Systems | | |
| 217 | Nuclear Power Control and Instrumentation | | |
| 218 | Radiation Shielding (Primary) | | |

Attachment 3

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal.

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN
ACCORDANCE WITH BOARD ORDER

File Name: OMN_PC3.xls
"BAFO"
Date: 2/10/97

O 005451